## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| <u>ex</u> <u>rel</u>. SUSANN CAMPBELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | EP-18-CV-193-KC |
| | § | |
| KIC DEVELOPMENT, LLC, RECA | § | |
| CONSTRUCTION, LLC, ANTHONY | § | |
| ACRI, CHRISTINE HAYES, | § | |
| EARL HALL, and JAMES G. TUSKAN | § | |
| | § | |
| Defendants. | § | |

## UNITED STATES OF AMERICA'S
## AMENDED COMPLAINT IN INTERVENTION

The United States of America (United States), on behalf of its agencies, the Small Business Administration ("SBA") and the Department of the Army ("Army"), files its Amended Complaint in Intervention and states as follows:

## I.       INTRODUCTION

1.       Plaintiff, the United States, brings this action against Defendants ANTHONY ACRI ("ACRI"), CHRISTINE HAYES ("HAYES"), EARL HALL ("HALL"), and JAMES G. TUSKAN ("TUSKAN") to recover treble damages, civil penalties and costs under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA), and to recover damages and other monetary relief under the common law and equitable theories of payment by mistake and money had and received.

## II.       PRELIMINARY STATEMENT

2.       This lawsuit seeks to recover millions of dollars improperly obtained through a conspiracy and scheme by and between, ACRI, HAYES, HALL and TUSKAN whereby ACRI, HAYES and

HALL paid bribes and kickbacks to TUSKAN, a U.S. Army Corps of Engineer ("USACE") contracting official, so that their employer, KIC Development, LLC (KICD) could obtain contracts in support of the U.S. Army's $3 billion effort to improve Fort Bliss in El Paso, Texas. The contracts were inflated in price so that ACRI, HAYES and HALL could siphon millions of dollars in taxpayer funds away from legitimate contractual purposes to benefit themselves personally.

3.      In carrying out this conspiracy and scheme, the Defendants knowingly submitted and caused KICD to submit false and fraudulent claims to the U.S. Army in violation of the FCA and the common law.   The claims were fraudulent because they were submitted under contracts the award of which had been induced by the Defendants through the fraudulent means of bribery and kickbacks, and through false representations concerning KICD's anticipated costs and profits. The claims were false because they falsely certified KICD's compliance with material terms of payment, including compliance with laws and contractual provisions prohibiting bribery and kickbacks and requiring the provision of honest services.

4.      Because the Defendants obtained and maintained these contracts through illegal kickbacks, bribes and misrepresentations, rather than through honest efforts, all claims submitted by the Defendants under the contracts are fraudulent and false and recovery is permitted by the FCA and common law.

### III.     JURISDICTION AND VENUE

5.      Counts I-III of this Complaint are civil actions by the United States against the Defendants under the FCA, 31 U.S.C. §§ 3729-3733.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

6.      Elements of Defendants' scheme to violate the FCA and the common law originated and were carried out in El Paso, Texas.   Additionally, Defendants performed

the contracts, which were obtained through illegal means, at Fort Bliss, which is in this judicial district. This Court, therefore, has personal jurisdiction over the Defendants and venue is appropriate in this district pursuant to 31 U.S.C. § 3732(a) which provides that any action under 31 U.S.C. § 3730 may be brought "in any judicial district in which...any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

## IV.   PARTIES

7.      The United States is the Plaintiff for whom recovery is sought pursuant to the FCA and common law.

8.      From June 2008 through July 2009, CAMPBELL was employed by KICD as an Office Manager at its office in Crystal City, Virginia. CAMPBELL eventually became the personal assistant of ACRI.

9.      ACRI was employed as the Chief Executive Officer of KICD and also served as its President and/or Vice-President. KICD was a subsidiary of the Alaskan Native Corporation (ANC), Kikiktagrut Inupiat Corporation (KIC), and, at the time of the conduct alleged herein, was 51% owned by KIC and 49% owned by Walton Invesco, Inc. (WII), a company incorporated in the State of Connecticut with its principal place of business in Connecticut. KICD conducted business primarily out of its office in Crystal City, Virginia.  Under government procurement rules, KICD, as a subsidiary of an ANC, was eligible to bid for sole source government contracts that eliminated the requirement for competitive bidding. By virtue of his 49 percent ownership of WII, ACRI owned a minority share of KICD. ACRI is currently incarcerated at a Satellite Camp, Federal Correctional Institution of the United States Bureau of Prisons located in Cumberland, Maryland.

10.    HAYES served as Vice-President of KICD.   HAYES is currently incarcerated at a Prison Camp of the United States Bureau of Prisons located in Alderson, West Virginia.

11.    HALL served as KICD's Project Manager, responsible for KICD's contracts to perform work for the USACE at Fort Bliss in El Paso, Texas. HALL is currently incarcerated at a Satellite Camp, Federal Correctional Institution of the United States Bureau of Prisons located in Anthony, Texas.

12.    TUSKAN was employed by an engineering company ("engineering company") to provide project management services to the USACE pursuant to a contract between the engineering company and the USACE. TUSKAN currently resides in Murphy, Texas.

## V.    LEGAL BACKGROUND

### A.  SBA Section 8(a) Business Development Program

13.    The SBA 8(a) program is a federally sponsored program intended to assist qualified small business owners by offering them sole-source, no-bid government contracts, while gradually positioning them to compete in the general marketplace. *See* 15 U.S.C. § 631; 13 C.F.R. §§ 124.508–09.

14.    In order to be eligible for admission to the Section 8(a) program, an applicant must be "a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals . . . and which demonstrates potential for success." *See* 13 C.F.R § 124.101.

15.    An A N C  is specifically identified as a small business concern which qualifies for Section 8(a) sole-source, no-bid government contracts.   *See* 15 U.S.C. § 632 (6)(A).

16.    The Section 8(a) program has allowed ANCs to establish self-sustaining economies that provide unprecedented levels of jobs, revitalization, and hope to thousands of native communities

in some of the most impoverished areas of this country.   Helaman S. Hancock, <u>America's War on Tribal Economies: Federal Attacks on Native Contracting in the SBA 8(a) Business Development Program</u>, 49 Washburn L.J. 717, 718 (2010).

17.     KIC is an A N C  formed in 1973 as a village corporation under the Alaska Native Claims Settlement Act ("ANCSA"). KIC is the village corporation for Kotzebue, Alaska.

18.     KICD was formed as a single member limited liability corporation by KIC in 2002 under the laws of Alaska.

19.     At the time of its incorporation, KICD was owned 100 percent by KIC. In 2005, WII purchased a 49 percent interest in KICD for $25,000. WII was owned by three individuals: ACRI (49%), Walter Baum ("BAUM") (49%), and Nancy Hill ("HILL") (2%). KIC owned the remaining 51 percent of KICD.

20.     As an ANC majority owned subsidiary, KICD initially qualified to bid for government contracts as a Section 8(a) organization throughout the country and any award to the company was non-protestable.   It was also granted a 10 percent price preference on government contracts in full and open competition as a ANC 8(a).

21.     KICD lost its eligibility to participate in the SBA 8(a) program, in part, due to the illegal activity of Defendants and due to the ownership structure of KICD.

   **B. Statutory and regulatory provisions**

22.     The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,"§ 3729(a)(i)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,"§ 3729(a)(l )(B). "Knowingly" is

defined to include actual knowledge, reckless disregard and deliberate indifference. § 3729(b)(1).   No proof of specific intent to defraud is required. *Id.*

23.     It is a violation of federal law to directly or indirectly, corruptly give, offer or promise anything of value to any public official or person who has been selected to be a public official, or offer or promise any public official or any person who has been selected to be a public official to give anything of value to any other person or entity with the intent to influence any official act or to influence such public official or person to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the United States.   *See* 18 U.S.C. § 201.

24.     It is a violation of federal law for two or more persons to conspire to defraud the United States in any manner or for any purpose.   *See* 18 U.S.C. § 371.

25.     It is a violation of federal law for an individual to execute, or attempt to execute, any scheme with the intent to defraud the United States or to obtain money by means of false or fraudulent representation in any contract provided by the United States.   *See* 18 U.S.C. § 1031.

26.     It is a violation of federal law to commit deprivation of honest services through bribery and by mail or wire fraud.   *See* 18 U.S.C. §§ 1346, 1349.

27.     It is a violation of federal law for a person to knowingly disclose contractor bid or proposal information, or source selection information before the award of a Federal agency procurement contract to which the information relates.   *See* 41 U.S.C. § 2102.

28.     It is a violation of federal law for a person to obtain contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates.   *See* 41 U.S.C. § 2102.

29.     It is a violation of Federal Acquisitions Regulations ("FAR") and of the Defense Federal Acquisitions Regulations ("DFAR") for a contractor to offer or provide a gratuity to a federal official in an effort to obtain a federal contract.   *See* FAR/DFAR 52.203-3

30.     It is a violation of FAR/DFAR for any person to provide, attempt to provide, solicit, accept, or attempt to accept any kickback for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract, or in connection with a subcontract relating to a prime contract.   *See* FAR/DFAR 52.203-7.

31.     It is a violation of FAR/DFAR for a recipient of a Federal contract to use appropriated funds to pay any person for influencing or attempting to influence a federal entity in connection with the awarding of a Federal contract.   *See* FAR/DFAR 52.203-12.

## VI.     THE SCHEME TO VIOLATE THE FCA AND THE COMMON LAW

32.     TUSKAN was hired on January 28, 2008 by the engineering company to provide project management services to the USACE pursuant to a contract between the engineering company and the USACE.

33.     TUSKAN's job responsibilities included determining the scope of work of construction projects, developing project management plans, preparing design and construction schedules and budgets, serving as the central source of information and coordinating the process of construction work, managing project delivery, and conducting site visits.

34.     As a Project Manager, TUSKAN had a fiduciary responsibility to provide his honest and best efforts on behalf of the United States.

35.     In his role as a Project Manager, TUSKAN had access to confidential government information including confidential pricing information. TUSKAN frequently traveled to El Paso in order to plan and manage USACE construction projects at Fort Bliss, Texas.

36.     One of the primary job responsibilities of both ACRI and HAYES was to obtain construction contracts with federal government agencies.

37.     In 2008, KICD opened an office in El Paso where HALL was employed. ACRI and HAYES were employed at KICD's Virginia office.

38.     On or before August of 2008, TUSKAN, while acting as a Project Manager for USACE, met HALL.

39.     It was agreed by and among the Defendants that in exchange for the illegal bribes and kickbacks paid by ACRI, HAYES and HALL to TUSKAN, he would use his position as a contract employee with the USACE, to provide confidential information to KICD to provide KICD with an illegal advantage in bidding on government contracts.

40.     It was further agreed by and among the Defendants that TUSKAN would use his position as a contract employee with the USACE to ensure that KICD was illegally awarded government contracts.

41.     It was further agreed by and among the Defendants that TUSKAN would use his position as a contract employee with the USACE to affect the price of the contracts awarded to KICD so that the United States would pay more for said contracts than it would have but for Defendants' illegal conduct.

42.     ACRI, HAYES, and HALL paid TUSKAN money, agreed to pay money in the future to TUSKAN and a companion of TUSKAN, and provided TUSKAN with other benefits and inducements in the form of meals and beverages, airline tickets, and other inducements while TUSKAN performed services as a Project Manager for the USACE.

43.     TUSKAN attempted to influence, influenced, and recommended the award of USACE contracts to KICD for projects on which TUSKAN was the Project Manager or was otherwise assigned to work on by the USACE.

44.     TUSKAN provided non-public, confidential, and proprietary USACE information to ACRI, HAYES and HALL to assist in and obtain the award of USACE contracts to KICD. TUSKAN was not authorized to provide such information to ACRI, HAYES or HALL.

45.     TUSKAN attempted to influence and influenced the decision to award contracts to KICD as direct awards through the Section 8(a) program, instead of procuring the award of USACE contracts through the competitive bidding process, thereby assisting ACRI, HAYES and HALL in illegally obtaining contracts for KICD.

46.     TUSKCAN defended and supported KICD's work performance when USACE employees expressed concerns and negative views of KICD's work performance.

47.     TUSKAN, ACRI, HAYES and HALL concealed from the USACE and did not disclose to the USACE the payment of money to TUSKAN, the agreement to pay money in the future to TUSKAN, the payment of money to TUSKAN'S companion, and did not disclose to the USACE the provision of meals and beverages, airline tickets and other benefits and inducements given to TUSKAN by ACRI, HAYES and HALL, both prior to the award of the USACE contracts and during the performance of USACE contracts.

48.     As a result of the foregoing conspiracy, KICD obtained award of the Solar Daylighting Project and the OMA Flagship Project.   KICD performed work on the Solar Daylighting Project from on or about May 11, 2009 until on or about February 5, 2010.   KICD performed work on the OMA Flagship Project from on or about October 12, 2009 until on or about October 28, 2012.

   **A.  The Solar Daylighting Project**

49.    TUSKAN was assigned to be the Project Manager for the USACE on the Solar Daylighting Project.

50.    On or about November 7, 2008, HALL sent an email to CAMPBELL, HAYES's assistant at the time, asking whether he should pick up the tab for TUSKAN when at lunch or dinner and whether he should pay for bar tabs. Around this time, HALL began taking TUSKAN to dinners and paid for them and expensed the meals and beverages to KICD for reimbursement.

51.    On or about November 12, 2008, TUSKAN sent an email to the USACE Contracting Officer for the Solar Daylighting Project, inquiring as to whether KICD was in a USACE database of contractors, which was a prerequisite for receiving a USACE contract.

52.    TUSKAN prepared a Statement of Work, project drawings and other documents for the Solar Daylighting Project and scheduled KICD to attend a site visit at Fort Bliss.   HALL attended on behalf of KICD.

53.    On or about November 24, 2008, TUSKAN sent an email to USACE employees requesting preparation of the Independent Government Estimate ("IGE").

54.    The IGE is a confidential government document prepared by the government that details the government's opinion on what constitutes a fair price for each component of the proposed construction project and must be used on all government construction contracts including direct award contracts. A bid that is much greater than the amounts listed in the IGE is unlikely to be accepted by the government.

55.    On or about December 1, 2008, TUSKAN sent an email to the USACE stating his understanding that they had all the necessary documentation for the Solar Daylighting Project and inquiring as to whether the Request for Proposal ("RFP") would be sent out.

56.     TUSKAN was informed the next day that KICD did not appear in the USACE's Central Contractor Registration ("CCR") database as having an El Paso office.   TUSKAN was notified via email that it would take approximately 30 days for KICD to complete the process and was asked if he would consider another contractor.

57.     TUSKAN forwarded this email to HALL and stated "See Below! This looks like it is not going to work. You said it was a done deal.   I can use [C.W.] from [D.N.] Construction as the main G.C and you can try to fit in somewhere... Call me ASAP."

58.     It was at that time, ACRI, HAYES and HALL quickly opened an El Paso office and on December 4, 2008, KICD's El Paso office was listed in the CCR database.

59.     On or about December 12, 2008, TUSKAN sent an email to the USACE stating the reasons why KICD should be awarded the Solar Daylighting Contract.

60.     On or about December 18, 2008, TUSKAN prepared a Justification of Procurement Method memorandum. This document must contain the justification for a Section 8(a) direct award, and was necessary in order for the project to be awarded as a Section 8(a) direct award. TUSKAN recommended the Section 8(a) contract be awarded to KICD.

61.     On or about February 23, 2009, HALL, with the aid and assistance of ACRI and HAYES, formed RECA Construction LLC ("RECA") as a Texas limited liability company. The Texas Secretary of State's correspondence to RECA was directed to KICD at KICD's Arlington, Virginia office.

62.     ACRI, HAYES and HALL formed RECA as a means of diverting money to a third company in furtherance of their illegal scheme to violate the FCA and the common law.

63.     HAYES and ACRI were signatories on RECA bank accounts. On or about May 24, 2010, RECA filed documents with the Texas Secretary of State to change its name to ACE General

Construction LLC ("ACE").   As with RECA, HAYES was a signatory on ACE checking accounts.

64.     On February 24, 2009 – one day after the formation of RECA, ACRI, as President of KICD, submitted a bid on Contract W9126G-09-C-0017, referred to as the Solar Daylighting contract.

65.     The Solar Daylighting contract provided for the installation of skylights at various buildings on Fort Bliss.

66.     On or about March 3, 2009, TUSKAN flew to Washington D.C. and met with ACRI and HAYES at KICD's office in Virginia. It was agreed that TUSKAN would steer future USACE contracts to KICD in return for payments from ACRI and HAYES.

67.     On or about March 16, 2009, TUSKAN prepared a Price Negotiation memorandum for the award of the Solar Daylighting Project to KICD.

68.     On that same date, TUSKAN sent to HALL  by email a confidential internal USACE document listing all USACE Fort Worth sector present and future projects.   TUSKAN did not have permission to provide this document to KICD, which was valuable to KICD  in that it listed future USACE construction projects before they were made public.   This document was a confidential government document that should not have been provided to any contractor.

69.     The Solar Daylighting Contract was awarded to KICD on Thursday April 2, 2009, with a value of $2,148,660.

70.     The day after the Solar Daylighting award was made to KICD, the CEO of a day lighting company that was interested in bidding the project, sent an email to TUSKAN in which he stated:

> We anticipate at the very least a robust competitive process for these funds that
> would be based on relevant experience, performance history and design/unit

performance data. To proceed with a project of this scope without contacting other significant players in the commercial daylighting industry seems to us, quite peculiar and certainly not in line with the other 50 or so projects we have completed in the military environment...If our information is correct, the current project includes installing 1050 units at a net cost of $900 per unit. That cost of $945,000 leaves $1.35 million dollars on the table if the published value of the ECIP was correct....

The CEO also sent a similar email to the USACE.

71.    On April 6, 2009, the email chain was forwarded to TUSKAN with the request for an explanation.   TUSKAN forwarded this email to HAYES.

72.    On April 7, 2009, HAYES emailed TUSKAN a memorandum from an attorney concluding that Alaska Native Corporation Section 8(a) direct awards could not be protested by another contractor.

73.    Shortly thereafter, TUSKAN emailed the Contracting Officer for the project and stated, "I'm getting ready to board my flight but I just remembered something.   I believe that I read in the FAR (Federal Acquisition Regulations) that 'ANC direct award cannot be protested'? You may want to check that out before we make the call later." TUSKAN's email did not make any mention of the fact that he obtained this information from HAYES.

74.    On, or about April 21, 2009, ACRI executed the Payment and Performance Bonds on behalf of KICD, which were required by the USACE to complete the contract award process.

75.    ACRI sent correspondence to the USACE, dated April 29, 2009, certifying that HAYES, as Vice President of KICD also had the authority to bind KICD to the contractual agreements and compliance in regards to the Solar Daylighting contract.

76.    On or about May 11, 2009 HAYES, as the Vice President of KICD, signed the Notice to Proceed issued by the USACE, acknowledging receipt of the contract.

77.     Following the award of the Solar Daylighting Contract, HAYES, ACRI and HALL caused KICD to enter into a subcontract on the project with RECA. Despite being employees of KICD, HAYES, ACRI, and HALL each were paid substantial sums through RECA from money earned by RECA on the Solar Daylighting Contract purportedly for consulting or construction management fees.

78.     On or about June 16, 2009, HALL purchased airline tickets for TUSKAN and TUSKAN's companion for travel from Dallas, Texas to Detroit, Michigan.

79.     On or about July 16, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

80.     On or about August 3, 2009, ACRI signed a check from KICD in the amount of $1368.65 to "Jim Tuskin" and caused it to be sent to TUSKAN, who deposited it into his bank account.

81.     On or about August 13, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

82.     On or about September 9, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

83.     On or about October 12, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

84.     On or about November 12, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

85.     On or about December 9, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

86.     On or about December 9, 2009, HAYES signed a check from RECA to TUSKAN in the amount of $100,000, the memo line notation being "Paid subcontractor-solar project payment #1," and caused it to be sent to TUSKAN, who deposited it into an Omni Industries bank account on or about December 14, 2009.

87.     On or about January 5, 2010, HAYES signed a check from RECA to TUSKAN in the amount of $70,000, the memo line notation being "Paid subcontractor Solar project cost," and caused it to be sent to TUSKAN, who deposited it into an Omni Industries bank account.

88.     On or about February 12, 2010, HAYES signed a check from RECA to TUSKAN in the amount of $30,000 the memo line notation being "Paid Solar project Professional fees (Final payment)," and caused it to be sent to TUSKAN, who deposited it into an Omni Industries bank account.

89.     In reality, the subcontract with RECA and subsequent payments were a means of diverting money so that Defendants could profit personally from the project.   The subcontract and the payments were not made for legitimate contractual purposes.   By virtue of the fraudulent scheme and conspiracy, at least $545,272.04 was paid in total to HAYES, ACRI, HALL, and TUSKAN (or companies owned by them) from the Solar Daylighting Contract through the subcontract with RECA.

90.     As part of the contracting process, KICD submitted a Cost and Pricing Proposal Cover Sheet in which HAYES certified that KICD's costs on the project would be $1,933,794 and that KICD's profit would be $214,866, for a total contract price of $2,148,660. The Cost and Pricing Proposal was a material misrepresentation in that it did not reflect the true cost of the contract to KICD and in fact falsely inflated the cost projection in an effort to hide from the United States the money that would be diverted to Defendants.

91.     KICD performed work on the Solar Daylighting Project from on or about May 11, 2009 until on or about February 5, 2010 and received final payment on or about January 24, 2011.

92.     Numerous clauses from the Federal Acquisition Regulations (FAR) and/or Defense Federal Acquisition Regulations (DFAR) were incorporated into the Solar Daylighting contract, some of which were incorporated by full text and others were incorporated by reference.

93.     All provisions of the FAR/DFAR which were incorporated into the contract, whether by full text or reference, are considered binding contractual provisions.

94.     Clause 52.203-3 of the FAR/DFAR, referred to as the Gratuities Clause, was incorporated by full text into the Solar Daylighting contract.   This clause prohibits a contractor from offering or providing gratuities to federal officials in an effort to obtain a federal contract.

95.     Clause 52.203-7, referred to as the Anti-Kickback clause, was incorporated by reference into the Solar Daylighting contract. The Anti-Kickback clause prohibits any person from providing, attempting to provide, soliciting, accepting, or attempting to accept any kickback for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract, or in connection with a subcontract relating to a prime contract.

96.     Another provision of the FAR/DFAR that was incorporated by reference into the Solar Daylighting contract was 52.203-12, known to as the Limitation on Payments to Influence Certain

Federal Transactions clause. This clause prohibits a recipient of a Federal contract from using appropriated funds to pay any person for influencing or attempting to influence a federal entity in connection with the awarding of a Federal contract.

97.    These clauses were material to the awarding of, and the payment of claims under the Solar Daylighting contract.   Said contract would not have been awarded, and the claims submitted under the contract would not have been paid if the government had been made aware of a violation of these clauses.

98.    The materiality of these clauses is evident by the fact that the same conduct which constitutes a violation of these clauses also formed the basis of Defendants' criminal convictions.

99.    The materiality of these clauses is further evidenced by the fact that the same conduct which constitutes a violation of these clauses also formed the basis, in part, for the exclusion of KICD from further participation in the SBA 8(a) program.

100.    KICD's representations as to its anticipated costs and profit in performing the contract were also material to the U.S. Army's decision to award the contract to KICD.

101.    In causing KICD to bid on and accept, the Solar Daylighting contract, and in causing KICD to submit claims to the U.S. Army under this contract, ACRI, HAYES and HALL caused KICD to explicitly and implicitly certify that they were in compliance with these contractual clauses.

102.    In particular, on April 13, 2009, when KICD submitted its bid on the Solar Daylighting Project, KICD expressly certified that it "agreed to perform the work required at the prices specified…in strict accordance with the terms of" the solicitation.   This included the above referenced FAR/DFAR clauses.

103.     Attached hereto as Exhibit A, is a spreadsheet that reflects payments made by the U.S. Army to KICD for claims submitted by KICD, ACRI, HAYES and HALL on the Solar Daylighting contract. Exhibit A is incorporated herein as if fully set forth.

104.     Each false claim was paid by the U.S. Army in the amounts and on the dates reflected in Exhibit A.

105.     Each invoice that resulted in the payments reflected in Exhibit A, was submitted shortly before the date reflected for the payment. The invoices were submitted by KICD at the direction of ACRI, HAYES and HALL.

106.     In submitting these claims for payment, KICD, ACRI, HAYES and HALL implicitly certified that they were in full compliance with all material terms of payment, such as the contractual clauses set forth above.

107.     KICD, at the direction of ACRI, HAYES and HALL, and in concert and conspiracy with TUSKAN, knowingly submitted false claims to the U.S. Army under the Solar Daylighting contract.   ACRI, HAYES, HALL and TUSKAN caused the submission of these false claims.

108.     The total amount of false claims paid by the U.S. Army on the Solar Daylighting contract to Defendants was $2,148,660.

   **B.  <u>The OMA Flagship Project</u>**

109.     In addition to the Solar Daylighting Project, TUSKAN had also been assigned to be the USACE Project Manager for a Fort Bliss construction project known as the OMA Flagship Contract, W9126G-09-R-0149.

110.     This contract involved the extensive renovation of several buildings at Fort Bliss.   As set forth below, TUSKAN pushed to have this contract awarded to KICD.

111.    In connection with the award of the contract, it was part of the scheme to defraud the United States and to obtain money by means of false and fraudulent pretenses, representations, promises, and omission of material fact, that TUSKAN received money, the promise to pay money in the future, meals and beverages, airline tickets, and other inducements, for himself, Omni Industries and his companion, from defendants ACRI, HAYES and HALL in exchange for: i) the exercise of influence and recommendation by TUSKAN that the contract be awarded to KICD; and ii) the provision by TUSKAN of non-public, confidential and proprietary information belonging to the USACE to ACRI, HAYES, and HALL to assist in bidding for the OMA Flagship contract and obtaining the award of said contract.

112.    On April 15, 2009, TUSKAN emailed USACE personnel concerning a direct award of the OMA Flagship Project to KICD.

113.    On or about April 23, 2019, TUSKAN prepared a Statement of Work for the OMA Flagship Project, which he emailed to USACE employees and stated, "Below is the $15,000,000 funding that I set up for the Direct Award through the SBA to [KICD] for this action."

114.    In an email to the USACE, TUSKAN explained that the project would be a direct award in order to eliminate the "logjam in contracting," and referring to KICD, stated that "[t]he scope will be given to them at which time they will price it out and if it compares with the IGE it will be awarded."

115.    On or about June 16, 2009, TUSKAN sent an email to ACRI, HAYES and HALL advising them that TUSKAN had added additional buildings to the OMA Flagship Project, listing the amounts valued for the work on each building, with an attached spreadsheet containing project information.

116.     On or about June 16, 2009, HALL purchased airline tickets for TUSKAN and a companion of TUSKAN.

117.     On or about June 29, 2009, TUSKAN responded by email to an email from an employee of KICD, requesting information for a contract/lease for TUSKAN's companion.

118.     On or about July 7, 2009, TUSKAN sent an email to HAYES and HALL with a draft Scope of Work for the OMA Flagship Project attached.

119.     On or about July 13, TUSKAN sent an email to HAYES and HALL with an updated draft of the Scope of Work for the OMA Flagship Project attached. TUSKAN explained that he was giving them a "heads up" before the RFP was released by USACE on July 15. The information contained in the email should not have been disclosed to a bidder prior to formal release of USACE's RFP.

120.     On or about July 16, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

121.     During 2009, TUSKAN had also been working on a significant construction project for the construction of a new fire station and military police facility at Fort Bliss, known as the Fire Station/MP Project.

122.     As with the Solar Daylighting and OMA Flagship projects; TUSKAN worked to steer the award of the Fire Station/MP Project to KICD.

123.     On July 22, 2009, TUSKAN sent an email to ACRI, HAYES and HALL in which he stated:

> I am the one that got it set up to go 8a on Monday this week, it was going to go "HUB" because they are at 2% and their target is 10%....Right now I have everything headed in the "right direction." They will not be going to their MATOC pool which would have blocked you from bidding. So right now you have three things in your favor 1. It will be open bid 8a. 2. You enjoy a 10% price advantage.

> 3. Chris & myself will be on the Selection Board. If you can convince Contracting
> to direct award "Bingo." As I said I'm doing my part. Now what about me?

124.    On July 29, 2009, HAYES sent an email to HALL with the subject matter "Tuskan Agreement." HAYES instructed HALL to give the agreement to TUSKAN.

125.    The unsigned agreement, entitled "Consulting and Engineering Services Agreement" was dated July 29, 2009 and provided that Omni Industrial International, Inc. (TUSKAN's company) would provide consulting services to RECA.   Exhibit B to the Agreement contained the following fee structure:

    1. 5 Buildings          $25,000.00
    2. Solar Daylighting     $200,000.00
    3. OMA Flagship          $800,000.00
    4. Fire Station          $TBD

126.    In reality, the Exhibit B referenced in the email reflected the agreement between TUSKAN and ACRI, HAYES and HALL as to the amount of money TUSKAN would be paid for helping to secure the 5 Buildings Project, Solar Daylighting and OMA Flagship contracts  for KICD.

127.    On May 25, 2009, TUSKAN had sent an invoice to RECA for $25,000 purportedly for reviewing drawings for RECA. On July 31, 2009, HAYES signed a check to Omni Engineering, TUSKAN's company, for $25,000, which she sent to TUSKAN.

128.    On or about August 3, 2009, ACRI signed a check from KICD in the amount of $1,368.65 to "Jim Tuskin" and caused it to be sent to TUSKAN, who deposited it into his bank account.

129.    On August 4, 2009, TUSKAN sent an email to HAYES and HALL attaching the USACE's IGE for the OMA  Flagship  Project. The IGE contained  confidential  government  pricing information which was not to be provided to a bidding contractor under any circumstance.

130.    On August 13, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

131.    On August 25, 2009, TUSKAN sent HAYES and HALL a revised IGE for the OMA Flagship Project that reflected an increase in the government's cost estimate. The email instructed HAYES and HALL to call TUSKAN when they received it.  TUSKAN was not authorized to send the revised IGE to HAYES and HALL, which contained a total cost estimate of $15.3 million.

132.    On or about September 2, 2009, ACRI and/or HAYES caused KICD to submit a bid to USACE for the OMA Flagship Contract that closely tracked the revised IGE and contained a total cost  of $15,646,000.

133.    On or about September 9, 2009, HAYES signed a check from RECA, in the amount of $5,000, for payment to TUSKAN's companion and caused it to be sent to the companion, who deposited it into her bank account.

134.    On or about September 14, 2009, TUSKAN sent an email to the USACE arguing against the  use  of one  contractor and lobbying  for a contract award to  another contractor on a project other than the OMA Flagship project (neither of these contractors was KICD).

135.    This impropriety came to the attention of the USACE and TUSKAN was subsequently barred from returning to  USACE  offices.

136.    On  or  about September 30, 2009, the engineering  company that had employed TUSKAN to perform project management services for the USACE terminated TUSKAN for engaging in inappropriate relationships with contractors.

137.    The OMA Flagship contract was awarded to KICD on, or about September 30, 2009.  The contract  award  amount  was  for  fifteen  million,  six-hundred  and  thirty-one  thousand  dollars ($15,631,000.00).

138.    On October 13, 2009, TUSKAN and ACRI executed an agreement under which TUSKAN would work as a consultant to KICD at a salary of $8,461.52 per month plus

expenses.

139.    On January 20, 2010, TUSKAN sent an email to HALL concerning a proposed future project for KICD. TUSKAN noted that he sure would "...like to see my agreement amended to reflect my commission due on OMA remodels for $800,000..."

140.    HALL forwarded the January 20, 2010, email to HAYES. Another consulting agreement was entered into between KICD and TUSKAN on February 1, 2010 in which TUSKAN was to be paid $4,166.66 per month in salary plus expenses.

141.    In addition to the consulting agreements in which TUSKAN was paid a salary and expenses by KICD, TUSKAN was also paid large amounts by RECA and ACE.

142.    On or about August 2, 2010, a check in the amount of $42,000 from RECA to Omni Industries, the memo line notation being "OMA#4 consulting fees," was signed and sent to TUSKAN, who deposited it into Omni Industries bank account.

143.    On or about August 25, 2010, a check in the amount of $52,000 from RECA to Omni Industries, the memo line notation "OMA#5 payment," was signed and sent to TUSKAN, who deposited it into an Omni Industries bank account.

144.    On or about October 4, 2010, a check in the amount of $25,000 from RECA to Omni Industries, the memo line notation being "OMA project#5 consulting fees," was singed and sent to TUSKAN, who deposited it into an Omni Industries bank account.

145.    On or about November 10, 2010, a check in the a mount of $35,000 from RECA to Omni Industries was signed and sent to TUSKAN, who deposited it into Omni Industries bank account.

146.    On or about November 24, 2010, a check in the amount of $88,000 from RECA to Omni Industries, the memo line notation being "OMA Payment #8," was signed and sent to TUSKAN, who deposited it into an Omni Industries bank account.

147.    On or about February 25, 2011, a check in the amount of $10,000 from ACE to Omni Industries, the memo line notation being "OMA #11," was signed and sent to TUSKAN, who deposited it into Omni Industries bank account.

148.    On or about April 28, 2011, HALL signed a check from ACE in the amount of $5,000 to Omni Industries, the memo line notation being "OMA #13 management fee," and caused it to be sent to TUSKAN, who deposited it into an Omni Industries bank account.

149.    On or about April 29, 2011, a check in the amount of $15,000 from ACE to Omni Industries, the memo line notation being "Project management fee," was signed and sent to TUSKAN, who deposited it into an Omni Industries bank account.

150.    On or about May 26, 2011, HALL signed a check from ACE in the amount of $10,000 to Omni Industries and caused it to be sent to TUSKAN, who deposited it into an Omni Industries bank account.

151.    On or about June 23, 2011, HALL signed a check in the amount of $20,000 from ACE to Omni Industries, the memo line notation being "OMA #15," and caused it to be sent to TUSKAN, who deposited it into an Omni Industries bank account.

152.    TUSKAN did not actually do any work on the OMA Flagship Project beyond steering the contract to KICD while at USACE.

153.    Similarly, TUSKAN's companion did not perform any work on the OMA Flagship Project.

154.    As with the Solar Daylighting Contract, HAYES, ACRI and HALL subcontracted a very large portion of the work to RECA, which they owned. However, RECA did no actual work and, in turn, hired other subcontractors to do the work.

155.    By having KICD retain RECA to hire the subcontractors that would perform the work on

the OMA Flagship, rather than having KICD enter into direct contracts with those entities, ACRI, HAYES and HALL were able to conceal their diversion of the USACE contract funds for their personal benefit.

156.    As with the Solar Daylighting Contract, HAYES, ACRI and HALL also caused KICD to enter into a subcontract on the project with RECA and ACE.

157.    HAYES, ACRI, HALL and TUSKAN each were paid substantial sums of money through RECA and ACE purportedly for consulting or management services on the OMA Flagship Contract; they performed no such services.

158.    ACRI, HAYES, and HALL were each paid additional sums through Tesla Energy 2 12 LLC (a company owned by HAYES) and Adatech Incorporated (a company owned by ACRI) by virtue of subcontracts awarded to these companies through RECA and ACE for purported work on the OMA Flagship Project.   No such work was performed by the Defendants.

159.    TUSKAN continued to receive illegal benefits from ACRI, HAYES, and HALL while working at USACE through payments made to him by RECA, ACE and Tesla Energy 2 12 LLC (the company owned by HAYES) and Adatech Incorporated (the company owned by ACRI).   He received these payments of USACE contractual funds in exchange for using his influence to steer USACE contracts to KICD and not in exchange for any legitimate services on the OMA Flaghsip project.

160.    In reality, the KICD subcontracts with RECA and ACE and subsequent payments to HAYES, ACRI, and HALL, through RECA, ACE, Tesla Energy 2 12 LLC and Adatech Incorporated were a means for the Defendants to divert government money from legitimate contractual purposes and profit personally from the project.

161.    KICD performed work on the OMA Flagship Project from on or about October 12, 2009 until on or about October 28, 2012, and received final payment on or about March 18, 2014.

162.    Numerous clauses from the Federal Acquisition Regulations (FARS) and/or Defense Federal Acquisition Regulations (DFARS) were incorporated into the OMA Flagship contract, some of which were incorporated by full text and others which were incorporated by reference.

163.    All provisions of the FAR/DFAR which were incorporated into the contract, whether by full text or reference, are considered binding contractual provisions.

164.    Clause 52.203-3 of the FAR/DFAR, referred to as the Gratuities Clause, was incorporated by full text into the OMA Flagship contract. This clause prohibits a contractor from offering or providing gratuities to federal officials in an effort to obtain a federal contract.

165.    Clause 52.203-7, referred to as the Anti-Kickback clause, was incorporated by reference into the OMA Flagship contract. The Anti-Kickback clause prohibits any person from providing, attempting to provide, soliciting, accepting, or attempting to accept any kickback for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract, or in connection with a subcontract relating to a prime contract.

166.    Another provision of the FAR/DFAR that was incorporated by reference into the OMA Flagship contract was clause 52.203-12, known to as the Limitation on Payments to Influence Certain Federal Transactions clause. This clause prohibits a recipient of a Federal contract from using appropriated funds to pay any person for influencing or attempting to influence a federal entity in connection with the awarding of a Federal contract.

167.    These clauses were material to the awarding of, and the payment of claims under the OMA Flagship contract.   Said contract would not have been awarded, and the claims submitted under

the contract would not have been paid if the government had been made aware of a violation of these clauses.

168.    The materiality of these clauses is evident by the fact that the same conduct which constitutes a violation of these clauses also formed the basis of the criminal conviction of the Defendants.

169.    The materiality of these clauses is further evidenced by the fact that the same conduct which constitutes a violation of these clauses also formed the basis, in part, for the exclusion of KICD from further participation in the SBA 8(a) program.

170.    In causing KICD to bid on, and accept, the OMA Flagship contract, and in causing KICD to submit claims to the U.S. Army under this contract, ACRI, HAYES and HALL caused KICD to explicitly and implicitly certify that they were in compliance with these contractual clauses.

171.    In particular, on August 5, 2009, when KICD submitted its bid on the OMA Flagship Project, KICD expressly certified that it "agreed to perform the work required at the prices specified…in strict accordance with the terms of" the solicitation.

172.    KICD, at the direction of ACRI, HAYES and HALL, and in concert and conspiracy with TUSKAN, submitted false claims to the U.S. Army under the OMA Flagship contract. ACRI, HAYES, HALL and TUSKAN knowingly caused the submission of these false claims in violation of the FCA.

173.    Attached hereto as Exhibit B, is a spreadsheet that reflects payments made by the U.S. Army to KICD for claims submitted by KICD, ACRI, HAYES and HALL on the OMA Flagship contract. Exhibit B is incorporated herein as if fully set forth.

174.    Each false claim was paid by the U.S. Army in the amounts and on the dates reflected in Exhibit B.

175.   Each invoice that resulted in the payments reflected in Exhibit B, was submitted shortly before the date reflected for the payment. The invoices were submitted by KICD at the direction of ACRI, HAYES and HALL.

176.   In submitting these claims for payment, KICD, ACRI, HAYES and HALL implicitly certified that they were in full compliance with all material terms of payment, such as the contractual clauses set forth above.

177.   The total amount of false claims paid by the United States on the OMA Flagship contract to Defendants was $15,784,417.00.

178.   By virtue of the fraudulent scheme and conspiracy, at least $3,444,808.05 was paid in total to HAYES, ACRI, HALL and TUSKAN (or companies owned by them) from the OMA Flagship Contract.

### C.  The False and Fraudulent Claims

179.   HAYES, ACRI, HALL and TUSKAN were each convicted of federal criminal offenses for the conduct outlined herein.

180.   All claims submitted or caused to be submitted by the Defendants under USACE contracts that were awarded as a result of acts taken by TUSKAN following a promise by one or more of the Defendants that he would receive financial benefit in exchange for such acts are false and fraudulent claims on the United States.

181.   All claims submitted or caused to be submitted by Defendants under USACE contracts that were awarded as a result of acts taken by TUSKAN following payments by Defendants in exchange for such acts, are false and fraudulent claims on the United States.

182.    All claims submitted or caused to be submitted by the Defendants under USACE contracts that were awarded as a result of false representations concerning KICD's anticipated costs and profits are false and fraudulent claims on the United States.

183.    All claims submitted or caused to be submitted by the Defendants under USACE contracts seeking funds that Defendants diverted from legitimate contractual purposes of their personal benefit are false and fraudulent claims on the United States.

## VII.    CAUSES OF ACTION

### Count I: False or Fraudulent Claims
### (31 U.S.C. § 3729(a)(l)(A) (2009), formerly 31 U.S.C. § 3729(a)(l)(2008))

184.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 184 as though fully set forth herein.

185.    The Defendants knowingly submitted false or fraudulent claims for payment, or caused false or fraudulent claims for payment to be submitted, to officials of the United States Government, in violation of 31 U.S.C. § 3729(a)(l)(2006) and 31 U.S.C. § 3729(a)(l)(A) (2009), to the extent the latter provision, which is an amendment of 31 U.S.C. § 3729(a)(1), applies to the conduct alleged herein.

186.    Because of the Defendants' conduct set forth in this Count, the United States has suffered damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count II:   False Statements
### (31 U.S.C. § 3729(a)(l)(B)(2009), formerly 31 U.S.C. § 3729(a)(2)(2008))

187.    Plaintiff re-alleges and incorporates by reference paragraphs I through 187 as though fully set forth herein.

188.    The Defendants have knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by officials of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(2008) and 31 U.S.C. § 3729(a)(l)(B)(2009), to the extent the latter provision, which is an amendment of 31 U.S.C. § 3729(a)(2)(2008), applies to the conduct alleged herein.

189.    Because of the Defendants' conduct set forth in this Count, the United States has suffered damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count III: False Claims Act–Conspiracy
### (31 U.S.C. § 3729(a)(l)(C)(2009), formerly 31 U.S.C. § 3729(a)(3)(2008))

190.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 190 as though fully set forth herein.

191.    ACRI, HAYES and HALL, individually and as employees of KICD, together with TUSKAN, conspired to submit or to cause the submission of false or fraudulent claims, and to make or cause the making of false statements to get false or fraudulent claims paid, in violation of 31 U.S.C. § 3729(a)(3)(2008) and 31 U.S.C. § 3729(a)(l)(C)(2009), to the extent the latter provision, which is an amendment of 31 U.S.C. § 3729(a)(3)(2008), applies to the conduct alleged herein.

192.    Because of the Defendants' conduct set forth in this Count, the United States has suffered damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count IV: Money Had and Received

193.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 193 as though fully set forth herein.

194.    By reason of the foregoing conduct and violation of federal law, Defendants hold money that in equity and good conscience belongs to the United States.  By reason of their conduct, Defendants were unjustly enriched and are liable to account for and pay such amounts, which are to be determined at trial, to the United States.

### Count V: Payment by Mistake

195.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 195 as though fully set forth herein.

196.    By reason of the foregoing conduct of the Defendants, the United States made payments under mistake of fact.

197.    As a result of these payments made by the United States under mistake of fact, the United States has sustained damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

Wherefore, Plaintiff, the United States demands judgment against Defendants as follows:

Under Counts I, II, and III (False Claims Act), for an amount of the United States' damages as required by law, plus such civil penalties as are required by law, together with all such further relief as may be just and proper;

Under Count IV (Money had and Received), for an accounting and the amount by which Defendants were unjustly enriched, plus interest and costs, and expenses, and all such further relief as may be just and proper;

Under Count V (Payment by Mistake), for an accounting and the amount the United States paid to the Defendants, plus interest and costs, and expenses, and all such further relief as may be just and proper;

Such other relief as the Court may deem just and proper, together with interest and costs of this action.

## DEMAND FOR JURY TRIAL

The United States hereby demands that this matter be tried before a jury.

Respectfully submitted,

**JOHN F. BASH**
UNITED STATES ATTORNEY
/s/ Eduardo R. Castillo
**EDUARDO R. CASTILLO**
Assistant United States Attorney
Texas State Bar No. 03984803
700 E. San Antonio, Ste. 200
El Paso, Texas 79901
Tel: (915) 534-6555
Fax: (915) 534-3490
eddie.castillo@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of May, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.   The foregoing was also served by regular mail via the United States Postal to the following defendant:

Christine Hayes
F. P. C Alderson Prison Camp
P.O. Box A
Alderson, West Virginia 24910

/s/ Eduardo R. Castillo
**EDUARDO R. CASTILLO**
Assistant U.S. Attorney